UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
**UNITED STATES OF AMERICA**        )
                                    )    **CRIMINAL ACTION**
            **v.**                  )
                                    )    **NO. 17-40034-TSH**
**RYAN FLYNN,**                     )
                                    )
            **Defendant.**          )
_____ )

## ORDER AND MEMORANDUM ON DEFENDANT'S MOTION TO SUPRESS (Docket No. 56)

**December 12, 2018**

**HILLMAN, D.J.**

Ryan Flynn ("Defendant") moves this Court to suppress the evidence obtained as a result of the interception of wire communications and the search of Defendant's home. For the reasons stated below, Defendant's motion (Docket No. 56) is ***denied***.

## Background

In 2016 and early 2017, Police believed Vito Nuzzolilo was involved in dealing large quantities of heroin and cocaine in and around Worcester, Massachusetts. Before obtaining a wiretap from this Court, the Government had investigated Nuzzolilo for almost a year. (Docket No. 61-2 ¶ 20) ("Wiretap Aff."). During this period, the Government utilized a variety of investigative methods including: physical surveillance, audio and video surveillance, telephone toll records, pen register and trap-and-trace information, telephone subscriber information, GPS tracking, statements of confidential sources, monitored and/or recorded phone calls, and queries of law enforcement records and intelligence databases. *Id.* ¶ 17.

Investigators learned that Nuzzolilo primarily distributed drugs from his top-floor apartment on Grafton Street in Worcester ("Grafton Apartment"). (Docket No. 61-1 ¶¶ 6-7) ("Apt. Aff."). Further, Nuzzolilo and his associates accessed the Grafton Apartment from a rear entrance via a parking lot. Wiretap Aff. ¶ 65. This parking lot was fenced and/or walled on all sides, and Nuzzolilo maintained video surveillance of the area. *Id.*; Apt. Aff. ¶ 10.

The confidential informant was able to learn that Nuzzolilo had sources in New York and Boston. Wiretap Aff. ¶ 61. In addition, the informant made a number of controlled purchases. For instance, on July 20, 2016, the informant met with Nuzzolilo at the Grafton Apartment and purchased 10 grams of heroin. *Id.* ¶ 28. On August 5, 2016, the informant made another purchase of 30 grams of heroin from Nuzzolilo's partner, Kristin Little. *Id.* ¶ 30-33. On December 6, 2016, the informant again purchased 20 grams of heroin from Nuzzolilo. *Id.* ¶ 37-39. Finally, on January 30, 2017, the informant purchased another 20 grams of heroin from Nuzzolilo. *Id.* ¶ 40-43.

In April 2017, because investigators lacked detailed knowledge of Nuzzolilo's sources of supply, the Government sought and obtained a wiretap authorized by this Court on Nuzzolilo's cell phone to learn more about how and from whom he acquired drugs.

The Government alleged that the cooperation of the informant alone, or in conjunction with other investigative means short of the interception of electronic and wire communications, would not be sufficient to meet the goals of the investigation. *Id.* ¶ 61. The Government noted that although the informant bought drugs from Nuzzolilo, the informant was unlikely to fully infiltrate or understand the operations of the wider drug trafficking organization. *Id.* For instance, the informant was "not privy to information such as the actual identify of NUZZOLILO's sources of supply, the distribution network of the Target DTO, or the organization structure of the Target DTO." *Id.*

In addition to the inability of the informant to provide more information about Nuzzolilo's supply chain, the affiant noted difficulties conducting physical surveillance and related investigative techniques at the Grafton Apartment. Wiretap Aff. ¶¶ 65-71; 92-93. According to the Government, the layout of the Grafton Apartment and its enclosed parking lot—coupled with Nuzzolilo's video surveillance of the area—meant that efforts to conduct surveillance of those accessing the parking lot would have likely led to detection. *Id.* The Government argued, however, that "continued surveillance done in conjunction with electronic surveillance" would "lead to the development of evidence sufficient to prosecute multiple members" of the enterprise. *Id.* ¶ 71.

Communications intercepted pursuant to the wiretap revealed that Nuzzolilo communicated with drug customers, often using coded language to refer to drugs. *See, e.g.*, Apt. Aff. ¶¶ 19, 23, 41. Further, Nuzzolilo communicated with drug suppliers. *Id.* ¶¶ 25, 26, 28, 29, 33-35, 43. Interceptions revealed that the Defendant was one of these suppliers. *See generally* Docket No. 61-3 ("Flynn Aff."). Defendant used a phone subscribed in the name Reid Marinelli. *Id.* ¶ 8. Agents confirmed that the communications were in fact from Defendant when "Marinelli" stated that he wanted to see Nuzzolilo on April 14, 2017 and updated Nuzzolilo on his whereabouts. Agents shortly thereafter observed the Defendant meeting with Nuzzolilo in a car outside of the Grafton Apartment. *Id.* ¶¶ 10-14.

The Government developed a substantial amount of evidence from the wiretap demonstrating that Defendant supplied drugs to Nuzzolilo including:

- In April 2017, Nuzzolilo owed a substantial drug debt to Defendant, and Defendant made plans to collect the money from Nuzzolilo. *Id.* ¶¶ 10-13.

- On April 14, 2017, Defendant traveled to the Grafton Apartment, presumably in order to collect a portion of the money Nuzzolilo owed him. *Id.* ¶ 14.

- On April 22, 2017, Nuzzolilo informed Defendant that he was in the process of collecting outstanding drug debts and would soon have money to pay Defendant. Two days later, however Nuzzolilo informed Defendant that he needed more time to collect the money that he owed Defendant. *Id.* ¶¶ 15-16.

- On April 27, 2017, Nuzzolilo told Defendant that he had a lot of money ("paperwork") and drugs ("stuff"). Nuzzolilo told Defendant that he was trying to sell the drugs in order to generate more money to pay Defendant. Defendant replied, "I just got people breathing down my neck buddy." *Id.* ¶ 17.

- On April 30, 2017, Nuzzolilo informed Defendant that he was "almost finished" and that he needed to see Defendant the next day. In addition, Nuzzolilo asked Defendant to "be ready for me"—presumably asking Defendant to be prepared to re-supply Nuzzolilo. Defendant replied, "Ready when you are." *Id.* ¶ 19.

- The next day, Nuzzolilo called Defendant to discuss an "issue" regarding "Thommy Walker," a "kid that works with me . . . up in Maine." *Id.* ¶ 20. Nuzzolilo was apparently referring to Thomas Walker, who had been arrested on April 27, 2017 after leaving the Grafton Apartment and stopped with approximately 1.9 ounces of cocaine in his car. Apt. Aff. ¶¶ 15-18. During an intercepted call before this stop, Nuzzolilo agreed to provide two ounces of cocaine ("two onions") to Walker and directed Kristin Little to distribute the cocaine to Walker. *Id.* ¶ 16. On May 1, 2017, when Nuzzolilo called Defendant, he explained that he had given Walker "two onions" and was unable to collect $4,000 that he expected to receive from Walker due to Walker's arrest. Flynn Aff. ¶ 20. Defendant replied, "I need some paperwork from you so what are we gonna do", and Nuzzolilo replied that Walker's arrest was "Fucking up my timetable." Nuzzolilo further stated, "I got

4

plenty: I got 50 racks I been sitting on, I just gotta go burn them off. Fire. I'm all out of the whi—I got plenty of one but nothing of the other. That's my issue." According to the Government, Nuzzolilo was indicating that he had $50,000 worth of heroin ("50 racks" of "fire") that he could sell to generate money to pay Defendant, but he was seeking to acquire additional cocaine ("the whi" and "the other"). Defendant responded, "it's been so long that my people been up my ass. I'm actually even giving them some of my own paperwork and you know I got bills due today." Apparently, Defendant's suppliers were applying pressure and he had been using his own money ("paperwork") to cover Nuzzolilo's debts. Defendant further directed Nuzzolilo to "give me what you can for today and then we'll see what we can do. I'll see if I can make something happen for you but at this point, it may or may not happen." Defendant was presumably telling Nuzzolilo to pay him today and that Defendant would attempt to secure additional cocaine for Nuzzolilo. *Id.*

- Later the same day, Nuzzolilo informed Defendant that he had $6,000 ("6 racks") and was in the process of collecting more to be paid to Defendant that night. *Id.* ¶¶ 22-23.

- Around the same time, Nuzzolili was telling certain customers that he had run out of cocaine. *Id.* ¶ 26. For instance, Nuzzolilo replied to one apparent customer, "I'm only with Carlos at the moment. I will not see the lady until later." Presumably, Nuzzolilo was indicating that he only had heroin ("Carlos") and would not have cocaine until later that day ("I will not see the lady until later"). *Id.*; *see also id.* ¶ 26 n.8.

- Later on May 1, 2017, GPS data showed that Nuzzolilo traveled to almost the exact location of Defendant's home. After leaving Defendant's home, Nuzzolilo traveled to his studio at 75 Webster St. in Worcester, Massachusetts (the "Band Room"). That evening, Nuzzolilo indicated that he now had a supply of cocaine at the Band Room. *Id.* ¶ 26(b).

5

- Also on May 1, 2017, as well as the following day, Nuzzolilo complained to Defendant about the quality of the cocaine that he obtained from Defendant. *Id.* ¶¶ 27-28. Accordingly, Nuzzolilo and Defendant discussed the return of the product and Defendant agreed to supply Nuzzolilo with new product. Defendant ensured that his source would "prepare right in front of me and show me there's nothing wrong with it." *Id.* ¶ 28.
- On May 4, 2017, GPS data indicated that Nuzzolilo again traveled within 1,000 feet of Defendant's home in Leicester, Massachusetts. *Id.* ¶ 29.
- After this trip, Nuzzolilo sent a text to Kristin Little that referenced Defendant's nickname ("Big Boy") and informed her that he was "all set nice." *Id.* ¶ 30.
- Finally, during this time, Defendant made cash deposits into a bank account. For instance, on April 4, 2017, Defendant made a $1,000 cash deposit. On April 6, he made a $2,900 cash deposit. On April 12, 2017, he made a $2,760 cash deposit. On April 21, 2017, he made a $1,450 cash deposit. *Id.* ¶ 32.

On May 23, 2017, Magistrate Judge Hennessy signed search warrants authorizing the search of Defendant's residence and his person. The warrants were based on applications that attested there was probable cause to believe that Nuzzolilo and others violated 21 U.S.C. § 846 by conspiring to distribute controlled substances and 21 U.S.C. § 841(a)(1) by distributing controlled substances, and to believe that evidence and other material items would be found at Defendant's residence and on his person. Flynn. Aff. ¶ 5. In the application, DEA Special Agent Andrew Snow noted that based on his experience, drug traffickers often use their personal residences to distribute and store drugs, collect debts, and store proceeds. *Id.* ¶ 4.

Government agents observed Defendant driving a truck on Route 9 in Worcester. *See* Docket No. 61-4. Defendant pulled to the side of the road, and agents approached his vehicle. *Id.*

Agents then asked Defendant to exit the truck and executed the search warrant for Defendant's person. *Id.* During the encounter, Defendant provided verbal consent for the search of his vehicle and informed agents that there was ten pounds of marijuana in the bed of the truck. *Id.* Agents subsequently discovered a large quantity of marijuana in the bed. *Id.* Agents then executed the separate search warrant for Defendant's residence and discovered another large quantity of marijuana. *Id.*

In August 2017, Defendant was indicted and charged with one count of conspiracy to distribute cocaine and two counts of possession of marijuana with intent to distribute. (Docket No. 4).

### **Rulings of Law**

*1. Wiretap*

Title II of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, promulgates the standards and procedures for the use of electronic surveillance. A judge may allow an application for interception of wire communications only when the following conditions are met:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried to be too dangerous; and
(d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or area about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). Defendant argues that the Government failed to satisfy the third requirement, otherwise known as the "necessity" requirement. 18 U.S.C. § 2518(3)(c).

Agents then asked Defendant to exit the truck and executed the search warrant for Defendant's person. *Id.* During the encounter, Defendant provided verbal consent for the search of his vehicle and informed agents that there was ten pounds of marijuana in the bed of the truck. *Id.* Agents subsequently discovered a large quantity of marijuana in the bed. *Id.* Agents then executed the separate search warrant for Defendant's residence and discovered another large quantity of marijuana. *Id.*

In August 2017, Defendant was indicted and charged with one count of conspiracy to distribute cocaine and two counts of possession of marijuana with intent to distribute. (Docket No. 4).

### **Rulings of Law**

*1. Wiretap*

Title II of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, promulgates the standards and procedures for the use of electronic surveillance. A judge may allow an application for interception of wire communications only when the following conditions are met:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried to be too dangerous; and
(d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or area about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). Defendant argues that the Government failed to satisfy the third requirement, otherwise known as the "necessity" requirement. 18 U.S.C. § 2518(3)(c).

The "necessity" requirement was "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 154 n.12, 94 S.Ct. 977 (1974). Thus, the wiretap applicant must demonstrate "that the government has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to a court-authorized wiretap." *United States v. Rodrigues*, 850 F.3d 1, 9 (1st Cir. 2017) (quotations marks and citations omitted). However, the First Circuit has "also made clear that the government need not demonstrate that it exhausted all investigative procedures." *Id.* (quotation marks and citations omitted); *see also United States v. Cartagena*, 593 F.3d 104, 109 (1st Cir. ("To establish necessity, the government is not required to show that other investigative methods have been wholly unsuccessful . . . nor must the government exhaust all other investigative measures before resorting to wiretapping." (citations omitted)).

In order to satisfy this requirement, "the government's affidavit must show with specificity why ordinary means of investigation will fail; conclusory statements without factual support are not sufficient." *United States v. Lopez*, 300 F.3d 46, 53 (1st Cir. 2002); *see also United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989) (noting that "bare conclusory statements that normal techniques would be unproductive, based solely on an affiant's prior experience" are insufficient to satisfy the necessity requirement).

Defendant argues that the Government successfully relied on controlled buys, physical surveillance, and financial evidence which obviated the need for a wiretap. While Defendant is correct that the Government at times successfully utilized these investigative methods, he shifts the goal posts of the investigation. While traditional investigative techniques might have been enough to prosecute Nuzzolilo, they would not have been sufficient to successfully uncover his suppliers and prosecute co-conspirators. *See United States v. Martinez*, 452 F.3d 1, 6 (1st Cir.

2006) (holding that broad investigative goals such as identifying suppliers and co-conspirators in a drug operation were "all discrete and realistic goals for a criminal drug investigation that . . . legitimately cast a wide net. They are similar to goals that we have approved for wiretaps in previous cases.").

In *Gianelli*, for instance, the defendants similarly alleged that normal investigative techniques proved successful and consequently wiretapping was premature. 585 F. Supp. 2d at 157. The Court, however, found the necessity requirement satisfied because, among other reasons, "[t]here was . . . no reasonable prospect that traditional investigative methods would expose the full scope and membership of the conspiracy." *Id.* at 158; *see also United States v. Rivera-Rosario*, 300 F.3d 1, 19 (1st Cir. 2002) ("Though the government's less intrusive methods had provided some valuable assistance in the investigation, much of the conspiracy's scope and dealings were still undisclosed."); *Rodrigues*, 850 F.3d at 10 ("We have regularly upheld affidavits in support of wiretap applications where the agents assert a well-founded belief that the techniques already employed during the course of the investigation had failed to establish the identity of conspirators, sources of drugs supply, or the location of drug proceeds."); *United States v. Scibelli*, 549 F.2d 222, 227 (1st Cir. 1977) ("A large-scale gambling conspiracy may by its structure and modus operandi give rise to a reasonable inference that other investigative procedures . . . reasonably appear to be unlikely to succeed if tried." (internal citations omitted)).

Here, the Government noted the shortcomings of the methods previously utilized. For instance, the informant would "not become privy to information such as the actual identity of the sources of supply." *Id.* ¶ 64. In addition, the physical surveillance would be unlikely to uncover the identity of Nuzzolilo's suppliers and would not reveal what took place inside the Grafton Apartment. *Id.* ¶¶ 65-71. Finally, agents could not identify any bank accounts utilized by Nuzzolilo

9

despite efforts to do so. *Id.* ¶¶ 97-100. Moreover, even if agents were able to identify financial institutions utilized by Nuzzolilo, given the nature of illicit narcotics transactions and the limitations of information reflected in financial records (for instance, sources of cash deposits or uses of cash withdrawals are not reflected), the information that could have been obtained would have been similarly unlikely to satisfy the goals of the investigation. *Id.* ¶ 102.

In addition, the Government articulated why other traditional investigative methods were unlikely to prove successful to accomplish the broad goals of the investigation. For instance:

- The introduction of an undercover agent—besides for the controlled buys noted above—was unlikely to bear fruit given Nuzzolilo's reluctance to sell large quantities of narcotics or divulge vital information to unfamiliar people and given the likelihood that an undercover agent posing as a customer would not be privy to information such as sources of supply or details regarding the distribution network. Wiretap Aff. ¶¶ 72-74.

- Physical search warrants would not have achieved the larger goals of the investigation and would have prematurely revealed the investigation if executed prior to advancement of the overall investigative goals. In addition, physical searches would be more effective if coordinated with information developed through the interception of calls concerning the immediate whereabouts of drugs or contraband. *Id.* ¶¶ 75-76.

- Search warrants for text messages were unlikely to assist the investigation because Nuzzolilo's cell phone provider does not retain the content of text messages. *Id.* ¶ 80.

- Interviews and grand jury subpoenas would likely have compromised the investigation. Indeed, a prior effort to interview an associate of Nuzzolilo had apparently resulted in Nuzzolilo changing telephones and telephone numbers. *Id.* ¶¶ 81-89.

10

- Trash searches would have likely compromised the investigation because of Nuzzolilo's use of video surveillance. *Id.* ¶¶ 90-91.
- Phone analysis such as pen registers or toll analysis could not provide sufficient information regarding Nuzzolilo's phone communications. *Id.* ¶¶ 94-95.

Thus, I find that the Government has shown that alternative investigative techniques would likely fail and the necessity of a wiretap.

### *2. Home Search*

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched." U.S. Const. amend. IV. The requisite probable cause exists when "the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it." *United States v. Aguirre*, 839 F.2d 854, 857-58 (1st Cir. 1988); *see also Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317 (1983) ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others."). "The magistrate issuing the warrant must look to the totality of the circumstances in order to ascertain the existence of probable cause. *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996) (citations omitted). Further, "[t]his holistic approach also applies when a district court is called upon to evaluate a magistrate's determination that, based on the totality of the circumstances indicated in a supporting affidavit, probable cause exists to search particular premises. *Id.* (citation omitted). Importantly, however, "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236, 103 S.Ct. 2317 (quotation marks and citation omitted).

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element." *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005) (quoting *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999)). Defendant argues that the United States has failed to satisfy either requirement.

*a. Commission Element*

Defendant argues that there is no evidence beyond mere suspicion that he engaged in criminal activity. (Docket No. 57 at 14). According to Defendant, Agent Snow makes numerous conclusory statements and provides no satisfactory basis for inferences drawn from coded language. *Id.*

First, the First Circuit has repeatedly recognized the appropriateness of law enforcement officers translating and explaining coded language in a variety of contexts. *See, e.g.*, *United States v. Henry*, 848 F.3d 1, 10 (1st Cir. 2017) ("Officers may . . . interpret the slang terminology used by drug dealers." (citation omitted)); *United States v. Rosado-Pérez*, 605 F.3d 48, 56 (1st Cir. 2010) ("[W]e have long held that government witnesses with experience in drug investigations may explain the drug trade and translate coded language for juries . . . ."); *United States v. Santiago*, 566 F.3d 65, 69 (1st Cir. 2009) (concluding that "it was not improper for the agents to testify as to the meaning of various slang references."). Thus, Defendant's categorical objections to Agent Snow's interpretation of and inferences from the coded language must fail.[1]

---

[1] Moreover, many of the inferences drawn by Agent Snow are almost inescapable. For instance, Agent Snow concluded that, based on his training and experience, Nuzzolilo used the term "onion" to refer to an ounce of cocaine. *See, e.g.*, Apt. Aff. ¶ 22(a). On April 27, 2017, Nuzzolilo told Kristin Little to give Tommy Walker two onions. Shortly thereafter, Walker was found with 1.9 ounces of cocaine. Apt. Aff. ¶¶ 16-18. Thus, when Nuzzolilo called Defendant on May 1, 2017, and told him that he had given Tommy Walker "2 onions," it was clear that Nuzzolilo was referencing two ounces of cocaine. Flynn Aff. ¶ 20.

Second, I find that there was evidence beyond "mere suspicion" that Defendant was engaged in criminal activity. "[P]robable cause does not demand certainty, or proof beyond a reasonable doubt, or even proof by a preponderance of the evidence—it demands only a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Rivera*, 825 F.3d 59, 63 (1st Cir. 2016) (quoting *Gates*, 462 U.S. at 235, 238, 103 S.Ct. 2317).

The Government supplied substantial evidence that Nuzzolilo was involved in drug trafficking and linked this activity to Defendant. Nuzzolilo's dealings with Defendant supported several reasonable inferences amounting to probable cause. *See United States v. Feliz*, 389 F. Supp. 2d 124, 126-27 (D. Mass. 2005) ("[P]robable cause may be demonstrated through reasonable inferences rather than from direct evidence."). For instance:

- Nuzzolilo owed a drug debt to Defendant. Flynn Aff. ¶¶ 10-14.
- Nuzzolilo updated Defendant about the status of drug sales and collections after Defendant requested the debt be paid. *Id.* ¶¶ 15-17.
- Nuzzolilo explained to Defendant that Walker's arrest impacted his ability to satisfy his debt. *Id.* ¶ 20.
- Defendant told Nuzzolilo that he would see "if I can make something happen for you" when Nuzzolilo informed him that he was out of one type of product. *Id.*
- On May 1, 2017, Nuzzolilo traveled to Defendant's home after notifying some customers that he was out of cocaine. Later that evening, he told a customer that he had cocaine. *Id.* ¶ 26(b).

- Nuzzolilo later complained about the quality of the product that Defendant gave him. Defendant then agreed to obtain new product and ensured it would be prepared in front of him. *Id.* ¶¶ 27-28.

These facts and the reasonable inferences drawn from them establish a fair probability that Defendant and Nuzzolilo were discussing drug transactions. Thus, I find that the commission element was satisfied.

### b. Nexus Element

Defendant also argues that the United States has failed to satisfy the nexus element. In order to satisfy this second element, the issuing magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. 2317. "The First Circuit of Appeals has held that probable cause to suspect that someone has committed a crime does not automatically give rise to probable cause to search that person's home." *United States v. Thompson*, 630 F. Supp. 2d 138, 143 (D. Mass. 2009) (citing *Feliz*, 182 F.3d at 88).

Nevertheless, "interpreting a search warrant affidavit in the proper commonsense and realistic fashion may result in the inference of probable cause to believe that criminal objectives are located in a particular place, such as a suspect's residence, to which they have not been tied by direct evidence." *Feliz*, 182 F.3d at 88. Accordingly, in some circumstances the nexus between the crime and the location to be searched "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]. *Id.* (alteration in original) (quoting *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979)). For instance, "[w]here there is evidence that a

defendant is an established and successful drug trafficker engaged in an ongoing distribution scheme, an inference may be drawn that he is likely to keep drugs and business records in his home." *United States v. Eng*, 571 F. Supp. 2d 239, 248-49 (D. Mass. 2008) (citing *Feliz*, 182 F.3d at 87-88).

In upholding searches of the homes of suspected drug dealers, the First Circuit has considered a number of factors such as:

1. a law enforcement officer's statement, drawn from training and experience, that drug traffickers frequently keep cash and records associated with their business in their homes, *see Feliz*, 182 F.3d at 87; *Ribeiro*, 397 F.3d at 50-51;

2. evidence that the suspect was a large-scale or long-time trafficker, and therefore needed a "safe yet accessible place" to store cash and customer records, *see Feliz*, 182 F.3d at 87-88; and

3. evidence that the suspect traveled directly between the home and the site of the drug transaction, *see Ribeiro*, 397 F.3d at 50-51, or that the suspect distributed drugs from his home, *United States v. Keene*, 341 F.3d 78, 82 (1st Cir. 2003).

Here, Agent Andrew Snow noted that "[b]ased on my training and experience, I am familiar with narcotics traffickers' methods of operation . . . [and] with the manner in which narcotics traffickers often use their personal residences to distribute drugs, store drugs, collect drug debts, and store drug proceeds." Flynn Aff. ¶ 4. Further, there is evidence that Defendant was a large-scale and long-time trafficker. For instance, on April 14, 2017, Nuzzolilo called Defendant to tell him that he had $11,000 for Defendant. *Id.* ¶ 12. In addition, Defendant's bank records demonstrate cash deposits of upwards of $30,000 between January and April of 2017 alone. *Id.* ¶ 32. Agent Snow additionally notes that "large cash deposits into a bank account often signify

that the account is used to deposit proceeds from drug sales or other illegal activity." *Id.* ¶ 32 n.11. The affiant also notes that these large cash deposits date back to at least 2014. *Id.* ¶ 32. Finally, there is evidence that Defendant distributed drugs from his home. The Government notes that on May 1, 2017, Nuzzolilo traveled to the area of Defendant's home to obtain drugs from Defendant.[2] On the same evening, Nuzzolilo went from having no supply of cocaine to again having cocaine. Flynn Aff. ¶¶ 23-26. Further, on May 4, 2017, Nuzzolilo complained about the quality of the product and asked to return it. Subsequently, Nuzzolilo again traveled to the area of Defendant's residence. *Id.* ¶¶ 27-30.

Thus, I find that the facts set forth in the affidavit, in conjunction with the reasonable inferences taken from them, establish a fair probability that evidence of Defendant's drug trafficking would be found at his home.

## Conclusion

For the reasons stated above, Defendants motion to suppress (Docket No. 56) is ***denied***.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN
DISTRICT JUDGE**

---

[2] Given the imprecise nature of cell phone GPS data, the government notes that Nuzzolilo was at the precise location of Defendant's home within a margin of approximately 14 meters. Flynn Aff. ¶ 23.